**IN THE COURT OF APPEALS OF IOWA**

No. 19-1937
Filed October 6, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ALF FREDDIE CLARK,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell,

Judge.

        Alf Freddie Clark appeals his convictions for first-degree murder, attempted

murder, and felon in possession of a firearm. **AFFIRMED.**

        Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for

appellant.

        Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant

Attorney General, for appellee.

        Heard by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**BOWER, Chief Judge.**

Alf Freddie Clark appeals his convictions for first-degree murder, attempted murder, and felon in possession of a firearm.  Clark fails to establish a violation of his due process rights based on prosecutorial misconduct or a violation of his right to confrontation based on admission of the deposition of a witness who was unavailable at trial.  We affirm Clark's convictions.

**I. Background Facts & Proceedings**

On December 27, 2015, Clark and Tacono Conner got into a verbal and physical confrontation at a gathering in apartment 208, which was across the hall from Clark's apartment 205.  Soon after the confrontation, the resident of apartment 208 told people to leave, and Clark returned to his apartment.

Conner left the apartment building with two others and met up with his girlfriend, Amy Stolki.  The group returned to apartment 208 to drink before going to a local bar.  As Conner and Stolki were leaving the apartment a short time later, Clark came out of his own apartment door and exchanged words with Conner.  Stolki heard shots.  Conner sustained a fatal neck and head wound; Stolki's jaw was shattered by a separate bullet.

Law enforcement secured the building and began to question the residents. The officers found bullet casings outside Clark's apartment door, but when asked, Clark said he had not heard anything, claimed he did not recognize Conner, and told the officer his name was "Freddie Parker."  During the investigation, Clark repeatedly asked to leave the building.  Clark provided his real name later that night when questioned by detectives.  Police also spoke with Clark's niece, Letesha Clark, who was present in apartment 205 at the time of the shooting.

When finally allowed to leave the building the next morning, Clark left his apartment and never returned. A material witness warrant was issued for Clark in state court, and a federal warrant was issued for Clark absconding from supervised release. Clark was found two years later in Arizona and arrested. He was transported to Iowa to face charges relating to the events of December 2015.

Following a seven-day trial in October 2019, the jury returned a verdict finding Clark guilty of first-degree murder, attempt to commit murder, and being a felon in possession of a firearm. Clark was sentenced to consecutive terms of incarceration.

Additional facts will be discussed where relevant.

Clark appeals, asserting the State committed prosecutorial misconduct by introducing testimony about his lack of truthfulness, depriving him of his due process rights, and admitting Letesha Clark's deposition testimony, which he asserts violated the Confrontation Clause.

**II. Standard of Review**

"We review constitutional issues de novo." *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017). "Trial courts have broad discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion." *Id.* (citation omitted). "We review denials of a mistrial and the giving of a cautionary instruction for an abuse of discretion." *Id.* at 811 (citation omitted). "We review the admission of evidence challenged as hearsay for the correction of errors at law." *Id.* at 810.

### III. Analysis

**A. Due process claim.** Clark claims his due process rights were violated by the prosecutor's misconduct in improperly eliciting testimony commenting on Clark's truthfulness. To establish a due process violation based on prosecutorial misconduct, Clark must establish proof of prosecutorial misconduct and that "the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). "[I]t is the prejudice resulting from misconduct, not the misconduct itself, that entitles a defendant to a new trial." *Id.* (citation omitted).

Clark relies on the principles discussed in *Graves*. "[I]t is well established that 'determinations of credibility are for the jury, and not for witnesses.'" *Id.* at 871 (citation omitted). Thus, questions asking a witness to discuss another witness's credibility invades the province of the jury. *Id.* at 871–83. The *Graves* court determined a prosecutor may not ask a defendant if another witness is lying or "call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments." *Id.* at 872, 876.

Clark filed a motion in limine requesting "the State, its attorneys, agents or witnesses" be prohibited from making any reference to "[a]ny evidence that Mr. Clark 'lied' about his name." The State resisted the motion, arguing Clark's use of a false name to investigators "goes directly to defendant's consciousness of guilt." The court ruled,

> In this case, defendant's motion is not directly aimed at the State asking him the "was he lying" questions. Rather, he seeks to bar the police officer witnesses from characterizing his statements as lying. The court agrees with defendant that the prosecutor's responsibility does not change regardless whether he is questioning

the defendant or another witness. In either event, "was he lying" questions are not allowed under *Graves*. Further, it would be incompatible with the rationale of *Graves* to ask questions that will invite police officer witnesses to characterize defendant as lying. With that said, the State is free to ask the officers what name defendant gave. The State can ask whether that was his real name. The State can argue the inferences to be drawn from defendant's using a false name. In short, there are other ways to make the point without use of the term "liar."

Testimony by one of the investigating officers identified Clark as answering the door to apartment 205 immediately following the shooting. The officer and prosecutor had the following exchange:

> [OFFICER MILLER]: . . . I just asked if he, you know, had seen or heard anything. He said no. I thought that was kind of odd being, you know, that we just had, you know, at least two shots fired right outside his door. I asked him again. He said no, you know, and just based on his demeanor, again, you know, I'm doing this long enough it just—some things were just not adding up, just didn't seem right.
> So, therefore, there was another officer out in the hallway. I asked him to step in, just because I just got that gut feeling that something wasn't right here. And, again, I didn't know if there was anybody else in the apartment, I didn't ask. But just in case, you know, if there was another gun in the back, you know, whatever.
> So another officer stepped in while I went and spoke to the female on the couch, but—
> Q. At some point did you or the other officer in your presence ask the defendant for his name? A. I did.
> Q. What did the defendant tell you his name was then? A. So at that time I asked his name. He said—he gave me . . . the name of Freddie Parker.
> Q. What happens next? A. And then that's when I asked the other officer to come in there. Therefore, I went over and spoke to the female on the couch. When I went over—
> Q. What was her physical demeanor when you spoke to her on the couch? A. Same. Exact same. Just—she wouldn't look at me, really. Yeah.
> Q. So after you speak with the woman—and did you identify her? A. I did. She told me her name was Letesha Clark, and she was the niece of Mr. Clark.
> Q. After that, what did you do? A. While I was speaking to her, you know, because I asked her, did you see or hear anything, and she said she heard—
> [DEFENSE COUNSEL]: Objection. Hearsay.

THE COURT: Sustained.

Q. After speaking with her, what did you? A. I left. I grabbed ahold of the officer—the other officer that was with me, and we exited the apartment.

Q. Where did you go once you and the other officer left the apartment? A. My lieutenant was on scene at that time. I therefore met up with him to fill him in as to what was going on.

Q. And then that lieutenant was . . . Lieutenant Woody? Who was your lieutenant at that point in time? A. Lieutenant Woody.

Q. What did you do once you filled Lieutenant Woody in? A. While speaking to him just, you know, I was telling him about, you know, the individual in apartment 205, as to something just wasn't adding up. There was a female in there, you know, just didn't feel right. He asked me what their name was.

[DEFENSE COUNSEL]: Objection. Hearsay.

THE COURT: Sustained.

Q. What did you do after you spoke with Lieutenant Woody? A. I figured out that Mr. Clark lied to me.

[DEFENSE COUNSEL]: Objection. Hearsay.

Q. Mr. Clark—

THE COURT: Okay.

[DEFENSE COUNSEL]: Your Honor, may we approach?

THE COURT: Hold on. I will sustain the objection. [Prosecutor], you can ask your next question.

Q. Mr. Clark had given you the name Freddie Parker? A. Correct.

Q. So after you speak with Lieutenant Woody, where did you go? A. Went to the manager's office to find out who actually lived in apartment 205.

Q. Without telling us what the manager said, did you talk to the manager about who rented apartment 205? A. Correct.

At the end of the officer's direct examination, Clark moved for a mistrial because the officer testified he concluded Clark lied, violating the limine order. The court denied the motion, ruling the question asked did not invite the violation.

Defense counsel requested a limiting instruction, which the court granted. Before cross-examination of the officer started, the court instructed the jury: "During Officer Miller's testimony, he offered an opinion regarding the truthfulness of the defendant, Mr. Clark. We generally do not allow witnesses to offer opinions

with regard to other people's truthfulness so you should disregard that testimony. Everybody understand that? All right. I see some nods yes. Very good."

In order to determine if the statements constitute prosecutorial misconduct, we evaluate the following questions:

> (1) Could one legitimately infer from the evidence that the defendant lied? (2) Were the prosecutor's statements that the defendant lied conveyed to the jury as the prosecutor's personal opinion of the defendant's credibility, or was such argument related to specific evidence that tended to show the defendant had been untruthful? and (3) Was the argument made in a professional manner, or did it unfairly disparage the defendant and tend to cause the jury to decide the case based on emotion rather than upon a dispassionate review of the evidence?

*Id.* at 874–75.

We evaluate the exchange as a whole, as the court instructed the prosecution not to ask "was he lying" questions or to ask the police officer questions inviting the characterization of Clark as lying. However, the prosecutor *was* free to ask what name Clark provided and to argue the inferences that could be drawn from the use of a false name. We find without further analysis no misconduct by the prosecutor. At most, the exchange might constitute prosecutorial error. *See State v. Schlitter*, 881 N.W.2d 380, 393–94 (Iowa 2016) (distinguishing prosecutorial misconduct as intentional or reckless violation of an obligation or standard, while prosecutorial error results from poor judgment or a mistake based on excusable human error).

If misconduct or error is found, then we determine whether prejudice resulted, considering: "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other

curative measures; and (5) the extent to which the defense invited the misconduct." *Graves*, 668 N.W.2d*.* at 877; *accord Plain*, 898 N.W.2d at 820 (considering prejudice caused by prosecutorial error.).

Applying the *Graves* prejudice factors, we find insufficient prejudice to merit a reversal on this issue. The statement was isolated, was made by one witness—not the prosecutor, was not invited by the prosecutor, was not overly probative, and occurred in the middle of a seven-day trial. The statement was peripheral to the central issues of the case, and the State presented strong evidence. The court issued an appropriate cautionary instruction telling the jury witnesses cannot opine on the truthfulness of others. The final factor—that the defense did nothing to invite the statement from the officer—is not enough by itself to establish prejudice.

Accordingly, Clark's due process rights were not violated by the exchange.

**B. Confrontation claim.** Letesha Clark gave a deposition in January 2019. When she could not be found for trial, the court admitted her deposition, and it was read into evidence; the transcript was not provided to the jury. Clark raises a Confrontation Clause claim relating to the use of the deposition testimony.

Generally, deposition testimony is barred by the rule against hearsay. *See* Iowa Rs. Evid. 5.801, .802. However an exception exists if the declarant is "unavailable as a witness," *see* Iowa R. Evid. 5.804(a), and gave testimony at a lawful deposition against a party who had "an opportunity and similar motive to develop it by direct, cross- or redirect examination," Iowa R. Evid. 5.804(b)(1). Clark does not challenge Letesha's unavailability but asserts his counsel did not have a "similar motive" to develop testimony during Letesha's deposition as she would have at trial. Clark also asserts the State failed to establish a sufficient

foundation for portions of the deposition admitting hearsay statements Letesha made to law enforcement.

*Motive.* Clark asserts his counsel's motivation at Letesha's deposition was "to gather as much information as possible" and counsel would not have asked many of the probing questions at deposition if she had known the deposition would be entered as evidence. Clark argues the deposition is prejudicial because the testimony is highly relevant to Clark's movements at the time of the shooting.

"[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *State v. Tompkins*, 859 N.W.2d 631, 640 (Iowa 2015) (alteration in the original) (citation omitted). The deposition was taken in preparation for this case, not for a tangential or unrelated matter. During the deposition, defense counsel had the opportunity to thoroughly question Letesha and explore her memories of the night of the shooting with a similar motivation to protect Clark. The testimony Clark identifies as prejudicial was not from questioning by defense counsel; rather, it was elicited by the prosecutor, who would have had a similar motive to develop the same testimony at trial.

After examining the testimony, we conclude Clark had an opportunity and similar motive to examine Letesha during the deposition, and its admission did not violate the Confrontation Clause. Therefore, we affirm the district court's admission of the deposition.

*Hearsay statements.* Clark sought to redact portions of Letesha's deposition where she was questioned about prior statements she made to law enforcement at an interview in 2015. The deposition took place over three years

after the shooting and Letesha's statements to law enforcement. In her deposition, Letesha refreshed her recollection by reviewing the transcript from her police interview.[1] The State then quoted part of the interview transcript in the course of questioning her. Clark asserts the quoted statements were not presented as refreshing Letesha's recollection but were meant to admit otherwise inadmissible hearsay statements.

After quoting statements from the interview, the State asked Letesha if she and the officer made those statements:

> Q. . . . . That's true; right? A. I mean—yeah, I guess. I don't remember the exact conversation, but I read it, yeah.
> Q. Okay. All right. A. I just don't remember the exact conversation.
> Q. You don't remember that conversation? A. I mean, I didn't remember it until after reading it. I mean, I don't—
> Q. Okay. So you didn't remember it earlier? A. Yeah.
> Q. And then when you read your statement— A. Yeah.
> Q. —it refreshed your memory; is that right? A. I mean, I still— after reading it, I still don't remember saying it. But it's in there, so I . . . .
> Q. So you must have said it if it's in here is what you're telling us? A. Yeah. I'm just being honest. I didn't remember the exact conversation. I'm being honest when I was talking to you earlier.

Clark objected to the admission of the quoted statements and Letesha's response:

> And what I'm saying is that it is just flat out quoted from her statement that normally that process and procedure wouldn't be allowed. You would have to follow certain methods to refresh that recollection or establish a foundation for an exception under past recollection recorded. And those things have—they weren't done like that in the deposition. I understand that those . . . procedures don't always happen. But we can't just let things in in a way that they wouldn't be able to ask it like that so—without establishing more foundation.

---

[1] The detectives who interviewed Letesha testified at trial and described her demeanor but did not discuss the substantive content of the interview.

The State asserted it was proper questioning about her statement and she was "being confronted with her statement and she agrees with it, so I think it's proper." The court ruled,

> That's come up multiple times during the course of this trial where a witness has been questioned about a prior statement when that testimony has been either inconsistent or not being able to recall what maybe they had stated. And this is really no different than that. So I think [the requested redaction] shall be admitted.

"[W]here the witness takes the stand and is available for cross-examination, the Confrontation Clause places no constraints on the use of the witness's prior testimonial hearsay statement." *Tompkins*, 859 N.W.2d at 640. But, "[w]hen a witness denies having any recollection in answer to a question, there lurks a danger that reciting an inconsistent statement to refresh the witness's recollection will be given weight as substantive evidence." *State v. Swift*, 955 N.W.2d 876, 883 (Iowa 2021). "While the State is 'free to try to make her admit she remembered the underlying facts bearing on the issue,' it is 'not free to read into evidence the prior statement.'" *Id.* (citation omitted).

Even after reading the interview transcript, Letesha stated she did not remember the conversation. After the State recited the exchange into the deposition record, she reiterated she did not remember making the statements. Knowing Letesha's memory was not refreshed, the otherwise-unadmitted police interview takes on the substantive weight warned of in *Swift. See id.* We find the court should have redacted the verbatim interview transcript recitation from the admitted deposition.

Yet, reversal is not required if the error is harmless. *State v. Kennedy*, 846 N.W.2d 517, 527 (Iowa 2014). To establish harmless error, "[t]he State must 'prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (citation omitted). In determining whether the State has proved beyond a reasonable doubt that the error was harmless, we ask what evidence the fact finder considered in reaching its verdict, and then "weigh the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone." *Id.* at 527–28. Only if the effect of the incorrectly admitted evidence is comparatively minimal can we find it did not contribute to the conviction. *Id.* at 528.

Clark had been in an altercation with Conner earlier in the night. Bullet casings were found outside Clark's door, which were later matched to a handgun owned by Clark's nephew and found in a neighbor's back yard two months after the shooting. Clark denied hearing any gunshots or knowing Conner despite the location of the shots and their recent exchange. Then, as soon as officers let him leave the apartment, Clark left and did not return, leaving the state for over two years. Other portions of Letesha's deposition discuss the timing of Clark opening the apartment door in relation to the gunshots and her memory of the evening. Stolki testified that as she and Conner left apartment 208, Clark stood in the doorway of apartment 205 and exchanged angry words with Conner, and she thought there would be a physical fight. Stolki stated she saw Clark step slightly back into the apartment, Conner put his hands in the air, she heard a gun going off, and then she was injured and on the ground. Stolki identified Clark as the shooter.

The challenged portion of Letesha's deposition consisted of her testifying she did not remember the conversation quoted to her from her interview. In the exchange, Letesha and the detective discussed why the shooting happened. Further, the recited portion of the interview was part of the lawyer's question, and the jury was instructed "statements, arguments, questions and comments by the lawyers" are not evidence. *See Swift*, 955 N.W.2d at 883.

When weighing the probative force of this evidence against that of the unredacted portion of the deposition, we find the evidence is so overwhelming that it is beyond a reasonable doubt the verdict would have been the same without the challenged portion of Letesha's deposition. *See Kennedy*, 846 N.W.2d at 528. We find the unredacted portion of the deposition did not have an effect on the verdict and the district court's denial of redaction constituted harmless error.

We find the prosecutor's exchange with the officer did not violate Clark's due process rights, his counsel had similar motivation in conducting Letesha Clark's deposition as at trial, and any error in admitting the unredacted deposition was harmless. Therefore, we affirm.

**AFFIRMED.**