# IN THE COURT OF APPEALS OF IOWA

No. 21-1244
Filed December 7, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRENTON MITCHEL HUNTLEY,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Emmet County, Don E. Courtney

(trial) and John M. Sandy (motion), Judges.


        Brenton Huntley appeals his convictions. **AFFIRMED.**



        Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.


        Considered by Bower, C.J., Tabor, J., and Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**BOWER, Chief Judge.**

Brenton Huntley appeals his convictions for domestic abuse assault by strangulation causing bodily injury, willful injury causing bodily injury, assault with intent to commit sexual abuse causing bodily injury, and first-degree harassment.[1] Huntley asserts prosecutorial error during closing arguments denied him a fair trial and there is insufficient evidence to support his convictions. Huntley did not establish prejudice from the alleged misconduct, and sufficient evidence supports the jury's verdicts. We affirm.

**I. Background Facts & Proceedings.**

A trial was held in May 2021. The jury found Huntley guilty of domestic abuse assault by strangulation causing bodily injury, willful injury causing bodily injury, assault with intent to commit sexual abuse causing bodily injury, and first-degree harassment. A reasonable fact finder could determine the following:

In the spring of 2020, Huntley was in a sexual relationship and living with J.F. in Emmet County.[2] In early June, the couple broke up, and Huntley moved to his grandparents' home in rural Emmet County south of Estherville.

On June 9, J.F. invited Huntley to go out for the evening. Huntley ate dinner with his grandparents, taking several medications for sleeping and pain. J.F. picked up Huntley around 6:30 p.m. in her four-door sedan.

They went to a casino in Emmetsburg, then drove back towards Emmet County. During the drive back, J.F. had to pull off the road due to a rainstorm, and

---

[1] The relevant statutes are Iowa Code sections 708.2A(5), 708.4(2), 709.11(2), and 708.7(2) (2020).

[2] Huntley did not consider it a relationship; he described it as "just friends with benefits."

they had consensual sex. J.F. and Huntley stopped in Estherville and Dolliver during their drive, eventually going to a bar in Arnolds Park.

At the bar, Huntley had several drinks, and J.F. had one. After a while, J.F. let Huntley know she was ready to leave and went out to her car to smoke a cigarette. Huntley came out with two other men, asking J.F. to give them a ride home because the bar was closing soon.[3] When they arrived at the men's home, Huntley wanted to stay, J.F. consented, and Huntley played drinking games with the men. After some time, J.F. wanted to leave and went outside to smoke. Eventually, the other men wanted to sleep and got Huntley to leave.[4]

During the ride back to his grandparents' house, Huntley was unhappy because he didn't want to leave Arnolds Park. As J.F. drove through Dickinson County, Huntley "was calling [her] a whore" and accused her of cheating on him with one of the men they had met earlier. J.F. said then "[h]e wrapped his hands around my neck" as she was driving. J.F. missed a turn, and as she was turning around, Huntley got out of the car, "jumped on top of the hood of my car, [and] was banging on my window screaming at me." Eventually Huntley got back in the car, and J.F. started back toward Emmet County.

---

[3] Huntley identified one of the men as "cousins with one of my friends."

[4] Huntley estimated they left the men's house as 12:40 a.m. and stated he had been "swigging" Jaegermeister while he was there. A Snapchat from Huntley's phone showed a room located in Arnolds Park with a timestamp of 1:31 a.m. Huntley testified the timestamp was because he had edited a video during the drive and they were almost back to his grandparents' home at that time. Snapchat is "a brand name for an image messaging service and application, through which users can share images that may be private and temporary or public and stored for retrieval." Snapchat,Dictionary.com, https://www.dictionary.com/browse/snapchat (last visited Aug. 17, 2022).

J.F. stated as they neared Estherville, Huntley "was hitting on me and wrapping his hands around my neck and pulled my hair." He also tried to jump out of the car again while it was moving. J.F. parked along the side of the road, and Huntley started running up to other vehicles on the highway and yelling. J.F. convinced him to get back in the car. After he got back in and as she drove towards his grandparents' home, he started hitting her again. When he realized she was taking him to his grandparents' house instead of her home, he tried to stop the car and began taking off his clothes.[5] He threw his shirt out the window on his grandparents' street and took off his pants and shoes.

J.F. stopped in Huntley's grandparents' driveway—she guessed around 2:00 or 2:30 in the morning. Once there, "[Huntley] tried to rip my clothes off of me and told me I was going to give him a son." Huntley shoved J.F.'s head into his lap, and she cried, telling him to stop and he was hurting her. Huntley bit her on her arm as she tried to push him away. Huntley then grabbed her by the hair and tried to pull her out through the passenger-side door. J.F. got pinned between the front seats on the center console, with Huntley "over top of me with his hands wrapped around my neck" and "told me he was going to kill me," even threatening

---

[5] Huntley's version differed. He testified as they neared the turn off to his grandparents' house, J.F. was angry and had been making threats against his family during the drive. She pulled off the highway around a quarter-mile from his grandparents' house, locked the doors, and was pulling on the sleeve of his short-sleeved sweatshirt. He pulled off his sweatshirt and got out of the car. They talked more through an open window, and Huntley asked for his shoes and phone which were still in the car, but J.F. drove away. Huntley swallowed around two dozen pain pills he had no prescription for and walked the quarter mile to his grandparents' house. He took off his clothes when he was outside the house because they were dirty from him falling in a ditch, then knocked until his grandmother let him in. He said the car clock said 1:39 a.m. during the argument in the car.

to do so in front of J.F.'s children. J.F. believed she was going to die. She placed her knee on the horn and started honking it, hoping help would arrive. Huntley responded by hitting her and trying to pull her knee from the steering wheel. Huntley got out of the car, and J.F. threw his keys out the door and drove away.

J.F. drove to a gas station where a friend was working, calling her on the way saying Huntley had attacked her and her head and chest hurt. J.F.'s friend described her demeanor when she arrived as "very timid, very shaky . . . shaking almost from head to toe." After her friend saw the visible marks on J.F.'s face, she called the police. J.F. began to feel pain from what had happened, including difficulty swallowing and hoarseness.

J.F. went with Deputy Schultes to the sheriff's office to report the assaults, with the interview happening around 4:00 a.m. The deputy took pictures of red marks and swollen areas on the right side of J.F.'s face. The deputy testified J.F.'s injuries were consistent with her account. J.F. went home.

Meanwhile, Huntley's grandmother testified sometime after midnight she "heard somebody hollering and pounding on the house, but no lights or anything pulled in." It was Huntley at the door in his socks and underwear, and she thought he was drunk.[6] They talked about what had happened for thirty to forty-five minutes, and Huntley passed out. Around 4:30 a.m., two deputies drove out to speak with Huntley at his grandparents' house. During his drive, Deputy Schultes saw a shirt lying on the south side of the road, consistent with being thrown out a

---

[6] When asked, she was unable to be any more specific about the time than "after midnight." Later that afternoon, Huntley's grandparents found his jeans and a sweatshirt outside, but did not find his shoes.

passenger window. Huntley's grandmother was awake and throwing something into their dumpster. Huntley was inside in the living room, hunched over on the floor and unresponsive, dressed only in his underwear. Deputy Schultes did not notice any marks, bruises, or injuries on Huntley. The deputy called for an ambulance as his attempts to wake Huntley were unsuccessful. Huntley was taken to the hospital. At the hospital, Huntley became "very agitated" upon seeing the deputy and was yelling, swearing, and cursing at him.

Just after noon, J.F. went to the hospital to have her injuries evaluated. J.F. told the nurse what had happened to her. The nurse took pictures of J.F.'s injuries on her head, arms, hip, and legs[7]; she said the bruises "appeared new." The nurse noted she could feel a lump on J.F.'s head by her temple, but did not photograph it.

The deputy met with J.F. again the evening of June 10 and obtained her written statement. The written statement was consistent with J.F.'s verbal statement and included some additional details. The deputy was able to observe more bruising, took more pictures of J.F.'s arm injuries, and took pictures of handprints and recent marks in the dust on J.F.'s car.

After the jury returned its guilty verdicts, Huntley filed a motion for a new trial, which the court denied. Huntley appeals.

---

[7] J.F. believed the hip bruising was from the console when Huntley was pulling her, her right leg bruises were from the shifter at the same time, and the left leg bruising was from Huntley hitting her to get her knee off the horn.

**II. Prosecutorial Misconduct or Error.**

We review claims of prosecutorial misconduct and denial of a mistrial for an abuse of discretion.  *State v. Plain*, 898 N.W.2d 801, 810–11 (Iowa 2017).

During closing arguments, the State used a PowerPoint slideshow to highlight specific points of its case.  Defense counsel objected to some of the prosecutor's statements.  Towards the end of the prosecutor's argument, three slides captioned "Defendant's Inconsistent Statements" appeared, discussing text messages and statements made to an officer that were not admitted at trial.

The prosecutor began reading each slide before clicking through.  On the first challenged slide, the prosecutor started reading the first bullet point, "He stated in his messages—oops, sorry."[8]  The prosecutor clicked through to the next slide and read the first bullet point: "The defendant told Sergeant Merrill that it was [J.F.] who knew the guys in the bar and not him, but . . . in a . . . ."[9] before clicking through. On the third challenged slide, the portion read included a quote from Huntley: "The defendant told officers that his version of events was, 'I broke up with a bitch and I called her retarded and then I got arrested . . . .'"[10]

At that point, defense counsel objected, and the court, counsel, and Huntley met in chambers to discuss the objection.  Defense counsel acknowledged the

---

[8] The full statement on the slide was, "He stated in messages to his grandmother that he "was so drunk, I passed out on the floor after I told you what she all said to me."

[9] This statement is the entire first bullet point on the slide.  The second bullet point referred to a text message to his grandmother where he names one of the men from the bar and says they went to that man's house.

[10] The full statement on the slide was: "The defendant told officers that his version of events was, "I broke up with a bitch and I called her retarded and then I got arrested the next fucking day."

State had reacted quickly on the first two slides and moved on, but expressed concern about the third slide. Counsel asked to review the slides and requested a mistrial. In support counsel stated, "There was not really any indication of words that inflammatory being used in the evidence in this case. I think that has so prejudiced the jury in this case that the court has no other option but to declare a mistrial."

The State responded the use of the three slides was unintentional and suggested a cautionary instruction for the jury to disregard the slides and statements as they were not facts in evidence. The prosecutor said, "It was inadvertent. I didn't change my PowerPoint after the defendant testified and I apologize."

After the in-chambers review, the objections to the first and second slides were withdrawn. Defense counsel agreed it was likely unintentional and did not call it prosecutorial misconduct. The court could not recall specific testimony, but remembered testimony similar to the statement from the third slide was in evidence or pretty close to it. The court noted the slides were presented "very quick[ly]" and "[t]he court's eyes weren't able to fully get them reviewed" during the argument itself, and considered any prejudice to be "miniscule." The court denied the defense's motion for mistrial but had the parties draft a cautionary instruction.

A cautionary instruction was added to the jury instructions, stating: "During the State's PowerPoint presentation, the last slide that was presented may or may not accurately reflect the testimony presented during the trial. The court instructs you that you are to disregard this slide as well as the verbatim reading from the slide during your deliberations."

Huntley filed a motion for new trial, asserting the court erred in denying the motion for mistrial and claiming "the curative instruction was insufficient to purge the prejudice resulting from the prosecution's misconduct." A new judge considered the motion, relying on the transcript and record in their decision.[11]

To establish a claim based on prosecutorial misconduct or error, a defendant "must demonstrate both that prosecutorial misconduct [or error] occurred *and* that the prosecutorial misconduct [or error] resulted in prejudice that denied the defendant a fair trial." *State v. Coleman*, 907 N.W.2d 124, 138–39 (Iowa 2018) (emphasis added).[12] Both misconduct and prejudice are required, and failure on either prong is fatal to the claim. *Id.* at 138. For purposes of the motion for new trial, the district court presumed the challenged actions constituted prosecutorial misconduct, but it found no prejudice to Huntley's right to a fair trial resulted. On appeal, the State did not challenge the presumption and proceeded directly to the question of prejudice. We do the same.

> In determining whether misconduct is so prejudicial as to warrant a new trial, we examine the following:
> (1) The severity and pervasiveness of misconduct;
> (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; (5) the extent to which the defense invited the misconduct.

---

[11] The trial judge was unable to hear the motion due to .

[12] Prosecutorial misconduct involves either a "reckless disregard of a duty to comply with the applicable legal standard or obligation" or "intentional statements in violation of an obvious obligation, standard, or applicable rule." *Coleman*, 907 N.W.2d at 139. "[P]rosecutorial error is based on human error or the exercise of poor judgment." *Id.* Based on the record by both State and defense counsel, the contested actions fall within the prosecutorial error rubric.

*Id.* at 140 (citation omitted). "The most important factor is the strength of the State's case against the defendant." *State v. Boggs*, 741 N.W.2d 492, 509 (Iowa 2007).

The statements were isolated, occurred at the end of a closing argument after three full days of trial, and—to the extent the slide statements were read to the jury—were consistent with other statements made by Huntley while on the stand. Thus, we find the misconduct was neither severe nor pervasive. On the second element, the district court summarized, "[T]he central issue was whether or not [Huntley] strangled [J.F.] Nothing in the quote indicates he did that."

The strength of the State's evidence relied on the jury's credibility determination of J.F. and Huntley—the only two persons involved in or witnessing the alleged assault. In addition to J.F.'s generally consistent testimony, the State presented corroborating witnesses—a friend of J.F., a sheriff's deputy, and a treating medical professional—supporting J.F.'s consistent account of the night and how her injuries occurred with photographs of the actual injuries. Huntley presented testimony from his grandmother concerning the time after he arrived at her house, his state of intoxication, and his own disjointed and confusing testimony. This factor weighs in favor of the State.

The State's attempt to speed through the challenged slides and the cautionary instruction provided to the jury immediately as part of its instructions are sufficient mitigation under these circumstances where the evidence is overwhelming. And finally, the defense did not invite the misconduct.

Weighing all the factors under the facts and circumstances of this case, we find no prejudice and no abuse of discretion in denying a new trial.

**III. Sufficiency of the Evidence.**

Huntley challenges the sufficiency of the evidence supporting his conviction for each of the four offenses.

"We review sufficiency-of-evidence claims for correction of errors at law." *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (alteration in original) (citation omitted). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

"Our system of justice vests the jury with the function of evaluating a witness's credibility." *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *Sanford*, 814 N.W.2d at 615 (alteration in original) (citation omitted); *see State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996) ("A jury is free to believe or disbelieve any testimony as it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive."). "The one exception, . . . is that 'the testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court.'" *State v. Lopez*, 633 N.W.2d 774, 785 (Iowa 2001) (citations omitted).

The majority of Huntley's sufficiency-of-the-evidence claims are attacks on J.F.'s credibility and based almost entirely on Huntley's testimony. The jury heard both J.F.'s account of the evening and Huntley's version of events and was able

to observe their behavior and demeanor.  The jury found J.F. more credible and convicted Huntley.  We defer to the jury's credibility determination.

Only Huntley's argument relating to the feasibility of the events occurring "within the confines of a small car" may have given the jury pause.  However, both J.F. and Huntley testified they had a consensual sexual encounter within the confines of the same four-door sedan earlier that night.  Given this undisputed fact, the jury could reasonably have concluded the occurrence of the described assaults within the car was plausible.

Considered in the light most favorable to the State, substantial evidence supports each of the jury's verdicts.

**AFFIRMED.**